RAWLS, Judge.
Plaintiff-appellant Evelyn Baker, mother of the minor decedent, appealed from an adverse directed verdict in a wrongful death action.
On January 5, 1961, about 1:30 P. M. on a clear day, John Montgomery, a twenty year old experienced horseman, was riding his quarter horse on the right shoulder of 103rd Street, Jacksonville. Riding with decedent about ten feet to his rear was his friend Donald Mansell who testified that Montgomery’s horse was “prancing”, as saddle horses do, until immediately prior to the accident when the quarter horse turned sideways with his rear protruding about one and one-half feet over the edge of the highway with all four feet off the pavement, his front feet moving and his hind feet stationary. The horse remained in this position about fifteen seconds prior to the accident, according to Mansell’s testimony, during which time Montgomery was kicking the horse and pulling at the reins trying to make the horse move. Montgomery was in this position when the horse was struck a glancing blow by a dump truck proceeding in the same direction as the horseback riders. The blow “threw” the horse clear but knocked Montgomery into the truck, according to Mansell who thought the truck was traveling fast, about 45 to 50 miles per hour, and so close to the edge of the road that its passing made his tight Levis flap.
The accident occurred on a straight stretch of road in a residential area with wide gradually sloping shoulders. The posted speed limit was 45 miles per hour. There were two or three riding stables in the neighborhood and people often rode horses on the shoulders of this road which at the time of the accident was heavily traveled due to construction on another road and nearby housing construction. The paved portion of 103rd Street was only 18 feet wide, and defendant’s dump truck, loaded with sand and weighing 58,000 pounds, measured 24 feet in length and 8 feet wide. Protruding from each side of the truck cab was a rear view mirror. The truck did not reduce speed until the point of impact. It left 18 feet of skid marks in the right lane immediately past the point of impact and *811 came to a stop 65 feet from point of impact. The horse, having only one small bruise on his right rear rump, was walked back to the stable, but Montgomery who lived 26 days after the accident had a large hole in his head and among other injuries had both legs crushed. The right front fender and the outside right rear view mirror of the truck were damaged.
The truck driver testified that: he was traveling about 30-35 miles per hour; he first saw the riders about 400-500 yards ahead of him off on the. dirt road which paralleled the paved street; their horses were walking; the horse “turned [heading away from the paved road] on the dirt road then kind of shook right back”; by then his rump was extending over the edge of the pavement; he could have slowed his vehicle if he had thought about it; when, he was 15 feet feet away, the “horse turned and wheeled out in the road in front of him”; he believed the entire horse was on the pavement but he hit the horse only a glancing blow; he did not remember any on-coming traffic; and he had “been around horses.”
Plaintiff’s witness Hawkins testified that he was about to enter 103rd Street. He looked to his left and saw the riders on horseback about three feet off the road on the shoulder. They were about 50 to 75 yards west of him and the truck, traveling 40-50 miles per hour, was about 50 yards west of the boys. He then looked to the right and saw a west bound car about 50 yards away. Five to ten seconds later when he looked back to his left, the accident had already occurred.
At the close of tlje trial the trial judge found that the doctrine of last clear chance did not apply and that Montgomery was guilty of contributory negligence. From the directed verdict entered for the defendant, plaintiff appealed assigning the above two conclusions as error.
A trial judge may direct a verdict for one party only if there is no suffi"cient evidence upon which a jury could legally find a verdict for the other party, but a directed verdict may not be granted merely because the preponderance of the evidence favors the movant. The party who moves for a directed verdict admits not only the facts proved by the evidence adduced, but also admits every conclusion favorable to the adverse party that the jury might fairly and reasonably infer from the evidence.[1]
 The general rule is that all users of the highways, including persons riding or driving animals, have equal rights thereon and a motorist having no rights superior to an equestrian, is under a duty to exercise care with respect to a person riding a horse.[2] Because of the tendency of horses to shy or bolt, motorists have been charged with the duty of exercising care to prevent the further frightening of a horse, if the motorist sees or in the exercise of ordinary care should see that the horse is in a fretful and uncontrollable condition, and to stop his vehicle rather than risk the most probable danger of collision by proceeding.[3] This duty to use care to prevent the further frightening of a horse appears to be a greater duty owed to horseback riders than would be owed under the same circumstances to a bicycle rider. It is somewhat comparable to the duty heretofore impressed upon motorists for the safety of small children who are walking, standing or playing in close proximity to a highway,[4] so due care when in the vicinity of *812 horses or when approaching a horse from the rear, may require an operator to travel at a speed less than the maximum permitted by law.[5]
In the instant case it is not contended that the noise of the dump truck frightened the horse and the facts clearly show that Montgomery was not attempting to use the highway but was riding two or three feet off the pavement. The latest judicial expressions[6] on the subject concur with the conclusion of the able trial judge that a skilled horseman is charged with knowledge of the propensities of a spirited horse and when riding on the shoulder of a highway, must use due care for his own safety and the safety of others. He is in a position to know when his horse is becoming fractious in advance of outward signs detectable by a passing motorist, and take precautions necessary for his own safety. Therefore, we hold that the trial judge was correct in holding that plaintiff’s decedent was guilty of contributory negligence.
The doctrine of the last clear chance was first pronounced in the landmark case of Merchants’ Transportation Co. v. Daniel,[7] in the following language, 149 So. on page 403:
“The courts are wide of an agreement as to the extent of the last clear chance doctrine as applied to the operation of automobiles and the like. It is certain however that there are two situations in which it is uniformly applied: (1) Assuming that a traveler has negligently placed himself in a dangerous situation upon the highway, whenever the person in control of a motor vehicle actually sees his situation and should appreciate his danger, the last clear chance rule applies without regard to the continuing negligence of the traveler concurring with that of the operator up to the very instant of the injury; (2) Where the person in control of a motor vehicle, by keeping a reasonably careful lookout, commensurate with the dangerous character of the motor vehicle while in operation and the niature of the locality, could have discovered and appreciated another’s perilous situation in time by the exercise of reasonable care to avoid injuring him, and the injury results from the failure to keep such lookout and to exercise such care, then the last clear chance rule applies, regardless of the injured person’s prior negligence whenever that negligence has terminated, or culminated in a situation of peril from which the exercise of ordinary care on his part would not thereafter extricate him. This latter phase of the rule applies whenever injury results from new negligence, or from a continuance of the operator’s negligence after that of the injured party has so ceased or culminated. * * * ”
[Emphasis supplied.]
The instant case is not one involving a factual situation where neither the injuring party nor the injured see the other until the point of impact. Here the truck driver saw the riders 400 to 500 yards away and he saw the horse when it turned and when it moved onto the highway. Any negligence attributable to Montgomery for letting his horse protrude over the highway or getting onto the highway when not attempting to use same was concurrent with any negligence attributable to the truck driver. Under this theory if the last clear chance doctrine is applicable, it is by virtue of part (1) of the above rule. The Supreme Court has elaborated on this part of the *813 rule in James v. Keene[8] holding that the doctrine was applicable when the evidence shows:
“(1) That the injured party has already come into a position of peril; (2) that the injuring party then or thereafter becomes, or in the exercise of ordinary prudence ought to have become, aware not only of that fact, but also that the party in peril either reasonably cannot escape from it, or apparently will not avail himself of opportunities open to him for doing so; (3) that the injuring party subsequently has the opportunity by the exercise of reasonable care to save the other from harm; and (4) that he fails to exercise such care.”
The James case (involving a factual situation somewhat analogous to the instant case) held that the trial judge should have instructed the jury on the doctrine of last clear chance since, from the proven facts — that the pedestrian having placed herself in a position of peril by crossing the street was actually seen by the defendant when she was slightly to the left of defendant’s automobile which was traveling at 30 miles per hour or 44 feet per second— the jury could have concluded that the time it took the plaintiff to walk from the left of the traffic lane to the right side of the lane where the impact actually occurred was sufficient in both time and distance to have permitted defendant to reduce speed sufficiently to avoid the injury.
Reverting to the instant case the undisputed facts are: the truck driver saw the riders 400 to 500 yards ahead of him; he did not reduce speed until the point of impact; there was no traffic on the other lane except one approaching car which at the time of impact was approximately 100 yards ahead; the horse received only a glancing blow on his right rear by the front right fender; the driver had “been around” horses and he could have slowed down, if he had thought about it. From among the conflicting facts the jury could have concluded that the truck was traveling 30 to 50 miles per hour; that the truck driver saw the horse turn while on the dirt road and back onto the paved road until the entire horse was on the pavement, or that at the time of impact the horse had been standing on the shoulder with his rear protruding over the highway for 15 seconds; that this distance and time would have been sufficient to allow the driver to slightly deviate his course or reduce speed enough to avoid the horse.
 Furthermore, the jury could have concluded that Montgomery by kicking the horse and pulling at the reins was attempting to extricate himself from the peril in which his horse had placed him. In which case, since the negligence of the plaintiff’s decedent had terminated, part 2 of the rule in the Merchants’ case could likewise be applicable. The jury could have concluded that the truck driver, who had “been around” horses, by keeping a reasonably careful lookout commensurate with the dangerous character of the 58,000 pound dump truck which was almost half as wide as the narrow highway upon which he was proceeding at a speed of 45-50 miles per hour through a residential area, should have realized the perilous situation of the rider whose horse was backing toward the edge of a narrow busy highway while being approached from the rear by a noisy dump truck, and by the exercise of due care could have avoided injuring the decedent. In determining due care of the truck driver and rider, while being confronted with a dangerous situation, it is not required that they exercise a greater degree of care than the exigencies of the situation permit since one required to act quickly is not supposed to act with the judgment of one who can deliberate.[9]
This review of the evidence reveals that although there is no question that the jury would have been warranted in returning a verdict for the defendant, it is likewise *814 concluded that plaintiff is entitled to have the factual issue determined by a jury under proper instruction on the doctrine of last clear chance.
Reversed and remanded for a new trial.
CARROLL, DONALD, Acting C. J., and WIGGINTON, J., concur.

. Budgen v. Brady, 103 So.2d 672 (Pla. App. 1st, 1958).

. 60 C.J.S. Motor Vehicles § 381. See also MS. subsection 317.01(24) MS. A., which provides that traffic regulations apply to persons riding animals.

. Plauche v. Consolidated Companies, La. App., 92 So.2d 298 (1957); 60 C.J.S. Motor Vehicles § 381 and cases cited therein.

. Connell v. Petri, 159 Pla. 67, 30 So.2d 922 (Ma.1947).

. 60 C.J.S. Motor Vehicles § 415.

. Gulf Stream Park Racing Association, Inc., v. Miller, 119 So.2d 749, 87 A.L.R. 2d 1174 (Fla.App.2d, 1960) ; and Alpha Construction Co. v. Branham, 337 S.W. 2d 790 (Ky.App.1960).

. Merchants’ Transportation Co. v. Daniel, 109 Fla. 496, 149 So. 401 (1933).

. James v. Keene, 183 So.2d 297, 299, 300 (Fla.1961).

. Panama City Transit Co. v. Du Vernoy, 159 Fla. 890, 33 So.2d 48 (Fla.1947).