550 So.2d 1113 (1989)
Mary Rose MAZZEO, Petitioner,
v.
CITY OF SEBASTIAN, Etc., Respondent.
No. 72744.
Supreme Court of Florida.
October 26, 1989.
*1114 Richard A. Kupfer of Wagner, Nugent, Johnson, Roth, Romano, Eriksen & Kupfer, P.A., West Palm Beach, for petitioner.
Roberts & Reynolds, and Jane Kreusler-Walsh and John Beranek of Klein, Beranek & Walsh, P.A., West Palm Beach, for respondent.
Cathy Jackson Lerman of Cathy Jackson Lerman, P.A., Fort Lauderdale, amicus curiae, for Academy of Florida Trial Lawyers.
Bonita L. Kneeland of Fowler, White, Gillen, Boggs, Villareal & Banker, P.A., Tampa, amicus curiae, for Florida Ass'n for Ins. Review.
GRIMES, Justice.
This case is before the Court upon the certification of the Fourth District Court of Appeal as a matter of great public importance. Mazzeo v. City of Sebastian, 526 So.2d 1003 (Fla. 4th DCA 1988). Pursuant to article V, section 3(b)(4), Florida Constitution, we have jurisdiction. The certified question reads:
IS THE DOCTRINE OF EXPRESS ASSUMPTION OF RISK RESTRICTED TO EXPRESS CONTRACTS NOT TO SUE AND CONTACT SPORTS, OR DOES IT ALSO INCLUDE OTHER ACTIVITIES IN WHICH A PERSON, FULLY APPRECIATING THE DANGER INHERENT IN THE ACTIVITY, VOLUNTARILY AND DELIBERATELY PARTICIPATES IN THE ACTIVITY?
Mazzeo, 526 So.2d at 1007.
Petitioner Mary Rose Mazzeo brought a negligence action against respondent City of Sebastian (city) in the Circuit Court of Indian River County for maintaining a dangerous condition in a public park and for failure to warn.
Petitioner suffered a broken neck when she dived off a platform into Swim Lake, an artificial lake located in a municipal park. There was no boating activity in the lake. Swimming was permitted, though no lifeguards were provided. The water was between three and four feet deep where Mazzeo dived. The city was aware that from time to time persons dived off the platform. The city had periodically posted "no diving" signs, but on the day of the accident these signs were gone. Only a faded, stenciled "no diving" warning that had been painted on the surface of the dock remained the day of Mazzeo's injury. Mazzeo, an experienced swimmer, dived off the platform in order to demonstrate correct diving form to her young daughter, including placing her hands over her head to protect it.
Linda Martino testified that before diving Mazzeo had stood in the very area of water where she was later injured. Martino said that Mazzeo at first rejected the entreaties of her boyfriend, James Roberts, to demonstrate her diving form because the water was not deep enough, but later went ahead with the dive. Roberts denied that Mazzeo had said anything about the water being not deep enough to dive. Mazzeo testified that she had no recollection of standing in the water near the dock nor saying anything to Roberts about the water being too shallow to dive. A swimming pool expert expressed the opinion that to maintain a platform two and one-half feet over the surface of water only four feet deep constituted a dangerous condition.
In a special verdict, the jury found negligence on the part of the city. However, the jury also concluded that Mazzeo knew of the existence of the shallow water, realized and appreciated the possibility of injury as a result of diving into the water, and having had a reasonable opportunity to avoid it, voluntarily and deliberately exposed herself to the danger by diving into the water. Because of its determination that Mazzeo had assumed the risk, the jury was not asked to make a finding with respect to comparative negligence. Concluding that Mazzeo's recovery was barred under the doctrine of assumption of the risk, the court entered judgment for the city. In a split decision, the district court of appeal affirmed the judgment.
In Blackburn v. Dorta, 348 So.2d 287 (Fla. 1977), this Court addressed the continuing viability of the doctrine of assumption of risk following the adoption of the rule of comparative negligence. In analyzing *1115 the various aspects of the doctrine, we first distinguished express assumption of risk from that which arises by implication. We then explained that implied assumption of risk may be divided into categories of primary and secondary. The term primary assumption of risk was simply another way of saying that the defendant was not negligent either because he owed no duty to the plaintiff in the first instance or because he did not breach the duty which was owed. Thus, implied primary assumption of risk is subsumed within the principle of negligence.
We then turned to an analysis of implied secondary assumption of risk. We explained that this affirmative defense could also be broken down into two categories based upon whether the plaintiff's conduct was reasonable (pure or strict assumption of the risk) or unreasonable (qualified assumption of the risk). We gave as an example a hypothetical situation in which a landlord has negligently permitted his tenant's premises to become highly flammable and a fire ensues. The tenant returns from work to find the premises on fire with his infant child trapped inside. He rushes in to save the child and is burned in the fire. Under the pure or strict doctrine of assumption of risk, the tenant is precluded from recovery because he voluntarily exposed himself to a known risk even though his conduct was reasonable under the circumstances. However, if the tenant was burned when he went into the blazing premises to retrieve his favorite hat, he would have assumed the same risk but his conduct would clearly be unreasonable. We observed that it was this last category of assumption of risk (qualified) which has caused so much confusion in the law of torts because of the lack of analytical difference between it and contributory negligence. We then held:
We find no discernible basis analytically or historically to maintain a distinction between the affirmative defense of contributory negligence and assumption of risk. The latter appears to be a viable, rational doctrine only in the sense described herein as implied-qualified assumption of risk which connotes unreasonable conduct on the part of the plaintiff. This result comports with the definition of contributory negligence appearing in Restatement (Second) of Torts, § 466 (1965). Furthermore, were we not otherwise persuaded to elimination of assumption of risk as a separate affirmative defense in the context herein described, the decision of this Court in Hoffman v. Jones, [280 So.2d 431 (Fla. 1973)], supra, would dictate such a result... . Is liability equated with fault under a doctrine which would totally bar recovery by one who voluntarily, but reasonably, assumes a known risk while one whose conduct is unreasonable but denominated "contributory negligence" is permitted to recover a proportionate amount of his damages for injury? Certainly not. Therefore, we hold that the affirmative defense of implied assumption of risk is merged into the defense of contributory negligence and the principles of comparative negligence enunciated in Hoffman v. Jones, supra, shall apply in all cases where such defense is asserted.
348 So.2d at 292-93.
The rationale adopted in Blackburn has been generally approved by a number of scholars. 4 F. Harper, F. James & O. Gray, The Law of Torts § 21.8 (1986); Fleming, Comparative Negligence at Last  By Judicial Choice, 64 Calif.L.Rev. 239 (1976); Kionka, Implied Assumption of the Risk: Does It Survive Comparative Fault?, 1982 S.Ill.U.L.J. 371; Comment, Assumption of Risk in a Comparative Negligence System  Doctrinal, Practical, and Policy Issues: Kennedy v. Providence Hockey Club, Inc.; Blackburn v. Dorta, 39 Ohio St.L.J. 364 (1978). The majority of jurisdictions which have adopted comparative negligence have also held that assumption of the risk has been merged into comparative negligence. 3 S. Speiser, C. Krause & A. Gans, The American Law of Torts §§ 13:33, 13:35, 13:36 (1986); Martin, Effect of Comparative Negligence on Common-Law Concepts, in 1 Comparative Negligence § 4.20[2][b][ii] (1987 & Supp. 1987). There are, however, several *1116 states which have retained the doctrine of assumption of the risk as a defense separate and apart from comparative negligence. E.g., Braswell v. Economy Supply Co., 281 So.2d 669 (Miss. 1973); Kennedy v. Providence Hockey Club, Inc., 119 R.I. 70, 376 A.2d 329 (1977).
In affirming the judgment against Mazzeo, the district court of appeal referred to that portion of Blackburn which said:
"It should be pointed out that we are not here concerned with express assumption of risk which is a contractual concept outside the purview of this inquiry and upon which we express no opinion herein.... Included within the definition of express assumption of risk are express contracts not to sue for injury or loss which may thereafter be occasioned by the covenantee's negligence as well as situations in which actual consent exists such as where one voluntarily participates in a contact sport."
526 So.2d at 1007 (quoting Blackburn v. Dorta, 348 So.2d 287, 290 (Fla. 1977) (citation omitted)) (emphasis omitted). The court construed this statement to mean that there were other circumstances besides those mentioned that might be included within the definition of express assumption of risk and that there were other situations besides contact sports in which actual consent might exist. Citing other district court of appeal decisions which had expanded the definition of contact sports to include aberrant forms of sporting activity, Robbins v. Department of Natural Resources, 468 So.2d 1041 (Fla. 1st DCA 1985); Gary v. Party Time Co., 434 So.2d 338 (Fla. 3d DCA 1983); Strickland v. Roberts, 382 So.2d 1338 (Fla. 5th DCA), review denied, 389 So.2d 1115 (Fla. 1980), the court concluded that Mazzeo was barred from recovery for having voluntarily exposed herself to the risks inherent in the activity of diving into shallow water.
There have been two decisions of this Court since Blackburn which bear on this issue. In Kuehner v. Green, 436 So.2d 78 (Fla. 1983), the plaintiff sued for injuries he received as a result of a karate takedown maneuver executed by the defendant during a sparring exercise at the defendant's home. The jury found both parties fifty percent negligent. However, the jury also responded affirmatively to a special interrogatory which asked if the plaintiff knew the existence of the danger complained of, realized and appreciated the possibility of an injury as a result of such danger, and having a reasonable opportunity to avoid it voluntarily and deliberately exposed himself to the danger. The court held that the voluntary participation in a contact sport with full knowledge and appreciation of the danger constituted express assumption of the risk which barred the plaintiff's recovery.
More recently in Ashcroft v. Calder Race Course, Inc., 492 So.2d 1309 (Fla. 1986), the Court considered a suit by a jockey who was injured in a fall that occurred when his horse veered across the racetrack toward an exit gap. The jury found that the negligent placement of the exit gap by the racetrack owner caused the accident and that the jockey was not negligent. However, the jury also found that the jockey had assumed the risk because he had unsuccessfully sought to get the exit gap moved after an earlier accident. In quashing the judgment against the jockey, this Court stated that even assuming express assumption of the risk applied to horse racing, the doctrine waived only risks inherent in the sport itself. We observed that riding on a track with a negligently placed exit gap was not an inherent risk in the sport of horse racing.
The knowing and voluntary participation in contact sports is at best only loosely characterized as an express assumption of the risk. However, as we recognized in Kuehner, this exception is based on waiver and is essential to protect the other participants from unwarranted liability for injuries due to bodily contact inherent in the sport. To expand this exception to include aberrant conduct in noncontact sports collides with the merger of assumption of risk into comparative negligence, which was accomplished in Blackburn.
Accepting the jury's findings as representing the true facts, there is little *1117 doubt that Mazzeo engaged in foolhardy conduct by diving into four feet of water. On the other hand, it seems equally clear that she did not dive with the intention of injuring herself, and she did not expressly agree to absolve the city of any liability if she did. While recognizing the danger, she dived in the improvident belief that she would be able to avoid being hurt. Under Blackburn, Mazzeo's conduct is properly characterized as implied secondary assumption of risk which is unreasonable (qualified) in nature, analogous in some respects to the tenant who rushes into the negligently burning house to retrieve his hat. As such, Mazzeo's conduct must be evaluated by the jury under principles of comparative negligence.
We quash the decision below and remand for a new trial. We express no opinion with respect to the issues of negligence and proximate cause because they are not before us. To the extent that they are inconsistent herewith, we disapprove the opinions in Robbins, Gary, and Strickland.
It is so ordered.
EHRLICH, C.J., and SHAW and KOGAN, JJ., concur.
McDONALD, J., concurs in part and dissents in part with an opinion, in which OVERTON, J., concurs.
BARKETT, J., did not participate in this case.
McDONALD, Justice, concurring in part and dissenting in part.
After also reviewing this Court's decision in Blackburn v. Dorta, 348 So.2d 287 (Fla. 1977), I cannot disagree that the doctrine called assumption of risk does not apply to the facts of this case. I note, however, that any failure to post readable "no diving" signs was not a legal cause of injury when the plaintiff knew both the depth of the water and that it was unsafe to dive, but then voluntarily dived. Likewise, the presence of the pier over shallow water, under these circumstances, would not be a legal cause of injury. Because the record clearly demonstrates the cause of the injuries to be the plaintiff's intentional conduct, the nexus between any claimed negligence and injury is broken. I would therefore approve the judgment for the city.
OVERTON, J., concurs.